# UNITED STATES DISTRICT COURT
## Eastern District of Wisconsin

DEANNA ALEXANDER,

        Plaintiff,

    v.                          Case No.  18-cv-1744

SCOTT WALKER, in his official capacity and for equitable relief only,
Wisconsin DEPARTMENT OF CHILDREN AND FAMILY SERVICES (DCF),
Deputy Secretary of DCF LISA MARKS, Attorney for DCF MARY BURKE,
in their individual capacities,
and STEVE F. TAYLOR,

        Defendants.

## COMPLAINT

### I.    NATURE OF ACTION

101.    Deanna Alexander, a dedicated female public servant, parent, licensed foster parent, and military veteran, brings this civil action under the First and Fourteenth Amendments to the U.S. Constitution and Title 42 U.S.C. § 1983 and § 1985 against Governor Scott Walker; the Wisconsin Department of Children and Family Services; Deputy Secretary of the Department of Children and Families, Lisa Marks; Attorney for the Department of Children and Families, Mary Burke; and Steve Taylor, in order to obtain damages and other appropriate relief for injuries arising out of the Defendants conspiring against her to deny her equal protection of the laws, retaliating

1

against her for her political affiliation, retaliating against her for her protected free speech opposing sex discrimination and harassment, and class-of-one discrimination inflicted on her, as well as the violation of her common law employment rights.

## II.    JURISDICTION AND VENUE

### A.    Jurisdiction

201.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (42 U.S.C. § 1983 jurisdiction).

### B.    Venue

202.  The Eastern District of Wisconsin is the proper venue for this action because the Plaintiff's claims arise within the geographical boundaries of the Eastern District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## III.   PARTIES

### A.    Plaintiff

301.    Plaintiff Deanna Alexander is an adult resident of the State of Wisconsin. Ms. Alexander was a Section Chief for the State of Wisconsin Department of Children and Families, Division of Milwaukee Child Protective Services, Ongoing Services Section until she was unlawfully terminated.

## B.     Defendants

302.    At all times pertinent, Defendant Scott Walker was the Governor of the State of Wisconsin, the official policymaker for the State of Wisconsin, and acting within the scope of his employment and under color of law.

303.    Defendant Lisa Marks is an adult resident of the State of Wisconsin.  At all times pertinent, Defendant Marks served at the pleasure of Governor Scott Walker as Deputy Secretary of the State of Wisconsin, Department of Children and Families (hereinafter DCF), and acted within the scope of her employment and under the color of law.

304.    Defendant Mary Burke is an adult resident of the State of Wisconsin.  At all times pertinent, Defendant Burke served as DCF's in-house counsel.

305.    Defendant DCF is an agency of the State of Wisconsin, with the capacity to sue and be sued.  At all times pertinent, DCF contained the Division of Milwaukee Child Protective Services (DMCPS), for which Plaintiff Alexander worked as the head of the Ongoing Services Section.

306.    Defendant Steve F. Taylor is an adult resident of the State of Wisconsin.

3

## IV.    ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

4001. The State of Wisconsin's highest level employees who serve under Governor Scott K. Walker fall into one of two categories (a) political appointees, and (b) civil servant career executives.

4002. Political appointees are employees who are appointed by an elected official, such as the governor, and for those positions, hiring decisions are permitted to be based on the employee's political affiliation and political support of the elected official and his or her party.

4003. In contrast, by law, in the recruitment, application, examination, and hiring processes for civil servant career executive positions there can be no discrimination on the basis of people's political opinions and affiliations, their exercise of First Amendment rights, or because of sex. By law, and without exception, the selection of civil service employees must be based solely on merit. *See* Wis. Stat. § 230.18-20.

4004. The value of civil servant career executives is that they are loyal to the citizenry, rather than to whomever happens to hold elected office at the time. Civil servant career executives provide institutional memory and consistency in government services, and they also provide the citizens of the state the benefits of merit and experience.

4005. Ms. Alexander is female, a military veteran, a parent, and a licensed foster parent, and was one of those valued civil servant career executives whose job entailed

4

always remaining loyal to the citizenry, and she always did so, right up to the day she was unlawfully terminated from state employment by the Defendants.

4006. In the summer of 2016, Plaintiff Deanna Alexander had been hired as a Section Chief for the State of Wisconsin Department of Children and Family Services.

4007. The position of Section Chief for the State of Wisconsin Department of Children and Family Services is a civil service career executive position, as to which discrimination on the bases of politics is forbidden by law. In other words, it is, by statute, a merit-based position, not a political appointment that may be made according to the political preferences of the Governor or his administration.

4008. Ms. Alexander had a long history of public service including advocacy for children, and was perfectly suited for the position.

4009. Ms. Alexander had also, since 2012, been elected by the people of Milwaukee County to serve on the Milwaukee County Board of Supervisors.

4010. Ms. Alexander's political office in Milwaukee County is officially non-partisan, but she was well known for being very conservative, especially on fiscal issues, and therefore was widely regarded as a Republican.

4011. Ms. Alexander discussed her duties as a Milwaukee County Board Supervisor at length during her interviews for the Section Chief position with the Department of Children and Family Services.

4012. Ms. Alexander explained in writing to DCF that her "acceptance of employment with DMCPS [Division of Milwaukee Child Protective Services] was

5

secondary in initial nature and thus contingent upon receiving assurances that such employment would be legally, ethically, and operationally compatible with continued and indefinite employment with Milwaukee County in the role of County Supervisor."

4013. It was determined and agreed by the State, Ms. Alexander, and Milwaukee County, that Ms. Alexander's ongoing duties as a Milwaukee County Board Supervisor would not conflict with her duties as a Section Chief for the State Department of Children and Family Services.

4014. It was determined and agreed by the State and Ms. Alexander that though Ms. Alexander would have to account for 40 hours per week, as would any full time State employee, she would be permitted to work a flexible schedule for the State so as to be able to meet all the needs of the citizens she served through both County and State employment.

4015. Dr. Robin Joseph, Ms. Alexander's direct supervisor, along with the agency attorney Mary Burke and HR, made it eminently clear that Ms. Alexander would be permitted to work a flexible schedule; and that she should always clock in while doing State work, and clock out when doing any County work or any personal/family tasks.

4016. A confirmation letter dated July 22, 2016, confirmed Ms. Alexander's "appointment to a Career Executive position of Program and Policy Chief (pay range 81-02) with the Department of Children and Families (DCF), Division of Milwaukee

6

Child Protective Services (DMCPS), Ongoing Services Selection, effective August 8, 2016."

4017. The letter confirmed that the work Ms. Alexander would "be performing is exempt from the overtime provisions of the Fair Labor Standards Act (FLSA), which means that [she is] considered a salaried employee and [is] not eligible for payment of overtime under the law."

4018. Finally, the letter confirmed that she could "account for [her] work absences by either working additional time" or by using paid leave.

4019. Ms. Alexander began employment as scheduled on August 8, 2016, and directly reported to Dr. Joseph, who in turn, directly reported to the Secretary's Office of the Wisconsin Department of Children and Families.

4020. On her first day, August 8, 2016, Ms. Alexander received a Memorandum from DCF stating in part, "Welcome aboard! Your previous community and county experience provides useful background for your job as the Division of Milwaukee Child Welfare Services (DMCPS) Ongoing Services Section Chief…You may continue to serve as a Supervisor while employed as the Section Chief."

4021. The August 8th letter also explained that she should not conduct any County business during the time that Ms. Alexander was in DMCPS work status, and that to "maintain records of [her] DMCPS time, [a] PeopleSoft timekeeping account will be set up for [her] to record start time, lunch time, stop time, *and any other non-DMCPS absences from the office during your normal work hours*." (emphasis added.)

7

4022. The August 8th letter also confirmed that the Division Administrator, Robin Joseph, could "approve, in advance, a daily schedule change on a case-by-case basis to accommodate County Board business…For example, you may request approval to begin work an hour early and work an extra hour at the end of the day in order to attend a two-hour County board-related meeting during the normal work day. Reasonable requests will be granted so long as they do not interfere with execution of your Section Chief responsibilities.  Otherwise, available leave time must be used for any County Board business, Milwaukee County business or political activities conducted during your scheduled DMCPS work hours."

4023. Ms. Alexander was also told that she was accepting a management position for a 24 hour operation and so she would need to be available at non-traditional times, such as nights.

4024. DCF-DMCPS is one of the only, if not the only, state department that operates on a 24 hour basis, rather than a typical work day.

4025. Over the next few weeks, a formal Outside Employment/Conflict of Interest Approval Request was signed.

4026. Dr. Joseph, Ms. Alexander's Supervisor and Division Administrator issued a statement determining that her indefinite work for Milwaukee County as Board Supervisor/Elected official would not be a conflict of interest on August 29, 2016, and this statement was joined by HR Director Rahal on September 1, 2016, and DCF legal counsel on September 13, 2016.

8

4027. Between her hire in August of 2016 and April 2018, Ms. Alexander's employment was going swimmingly.

4028. Ms. Alexander consistently received positive performance evaluations and praise from her supervisor, Dr. Joseph, who considered Ms. Alexander an excellent employee.

4029. On February 10, 2017, Ms. Alexander's supervisor, Dr. Joseph, signed a performance review of Ms. Alexander, in which Ms. Alexander had met every standard applicable to her.

4030. Effective April 16, 2017, Governor Walker appointed Lisa Marks as the Deputy Secretary of the Wisconsin Department of Children and Families, a political appointment position.

4031. Previously, Lisa Marks and Governor Walker had worked closely together in Milwaukee County government.

4032. Prior to assuming office on or about January 3, 2011, Governor Walker had been the Milwaukee County Executive.

4033. As Milwaukee County Executive, Governor Walker had worked closely with, and developed strong political ties to, several individuals, including Cindy Archer, Lisa Marks, and Steve Taylor.

4034. Once elected governor, Governor Walker's administration, i.e., his political appointees, immediately began violating the law by ousting civil servant career executives – those valuable high level State employees

9

who are to remain loyal to the people and not be chosen on the basis of the political ideology of whatever administration happens to be in power - so they could be replaced with persons who were perceived as being more politically loyal to Governor Walker.

4035. For example, upon being elected, Governor Walker appointed Ms. Cindy Archer to the position of Deputy Secretary of the Wisconsin Department of Administration, which is a political appointment position, and Ms. Archer assumed office on or about January 3, 2011.

4036. Ms. Archer immediately, prior to even taking office, began scheming as to how the Walker administration could skirt the requirement that civil servants be employed solely based on merit and planned to illegally oust and replace career executive civil servants based on political affiliation.

4037. On or about October 22, 2010, Ms. Archer emailed Mr. John Hiller, Governor Walker's campaign treasure, telling him, in pertinent part (emphasis added):

> I don't want to get ahead of ourselves but Kelly[1] suggested I contact you. My workload related to the campaign and the county budget has eased up a bit and I wanted to let you know if you need any help with transition issues, I would be more than happy to help in any way I can...I still have a number of trusted contacts in state government and I understand how the bureaucracy works.

---

[1] "Kelly" refers to Kelly Rindfleisch who is Gov. Walker's former deputy chief of staff who was convicted of misconduct in office and served a sentence following her felony conviction of doing campaign work at her taxpayer-funded job.

10

...

I have a detailed understanding of the state budget process, the state budget office, the operations of DOA, civil service process, operations of the Gov Office and legislature and **ways to get rid of people or reassign folks that will not be helpful to SKW**. I also still have a number of contacts within state government that I can trust and count on when SKW returns. For example in addition to appointees, **there is a category called Career Executives that are the highest level of civil servants. People holding these positions could pose the biggest obstacle to SKW's goals. There are ways to move them to positions where they would pose less of a risk for SKW.** The transition team needs to identify who are in these positions and where the problematic ones could put asap. **They are the real powerhouse of state government and they are civil service but there are ways to minimize their role in a Walker administration.**

I along with others know people that should be on the "out" lists as well as some good people ousted by the Dems that may be willing to come back and serve under SKW....

4038. By "SKW," Ms. Archer was referring to Governor Scott Kevin Walker.

4039. On information and belief, this illegal practice of making employment decisions for State civil service positions on a political basis is still occurring, to this day, in Defendant Walker's administration.

4040. As Milwaukee County Executive, Governor Walker had, in 2009, named Lisa Marks to head the County's largest department, the Department of Health and Human Services.

11

4041. When Walker placed Marks into that position, she had no mental health or hospital administration background.

4042. Marks was placed in that position solely because of her political loyalty to Walker.

4043. Chris Abele, a Democrat, was elected by the people of Milwaukee County following Walker's election as Governor. Abele took the oath of office to become Milwaukee County Executive on April 25, 2011.

4044. Chris Abele, as the new County Executive, terminated Lisa Marks.

4045. On information and belief, Lisa Marks resented Mr. Abele for her termination, and sought to retaliate against him and those who worked closely with him in Milwaukee County government.

4046. After Ms. Marks was terminated by Mr. Abele, Governor Walker named her as the Administrator of the Division of Energy, Housing and Community Resources at the Wisconsin Department of Administration, a political appointment position. She remained in this position for a number of years, until 2017, when Governor Walker appointed her Deputy Secretary of DCF.

4047. Shortly after Governor Walker moved Ms. Marks from the DOA to her position as Deputy Secretary of DCF in the spring of 2017, Ms. Marks learned that Ms. Alexander had a close professional relationship

with Mr. Abele, and began a campaign of unwarranted and illegal harassment, discrimination, and retaliation against Ms. Alexander.

4048. In the spring of 2018, Ms. Alexander ran a public campaign for reelection to her seat as Milwaukee County Supervisor for the 18th District.

4049. Part of her re-election campaign focused on her exceptional working relationship with Mr. Abele.

4050. On information and belief, Ms. Marks saw the opportunity to get back at Mr. Abele for terminating her, by exerting her supervisory control over one of Mr. Abele's cohorts in Milwaukee government, Ms. Alexander.

4051. On information and belief, in early 2018, Ms. Marks and Steve Taylor, a Republican Milwaukee County Supervisor, began scheming as to how to unlawfully oust Ms. Alexander from her State job.

4052. On March 28, 2018, Ms. Alexander wrote an article speaking out against the sexual harassment and sex discrimination she had experienced at the hands of Steve Taylor, with whom she had been thrust into association because he was a Milwaukee County Supervisor.

4053. Mr. Taylor is a Republican and a close political ally of Governor Walker.

13

4054. Mr. Taylor has worked on or volunteered for Governor Walker's campaigns for years, including his first campaign for governor in 2010.

4055. Mr. Taylor and Governor Walker also get together at least annually for a social visit and a photo at the State Fair:



Supervisor Taylor and Governor Scott Walker at the 2017 Wisconsin State Fair

4056. Ms. Alexander's article explained in detail how Steve Taylor discriminated against her because of her sex, refusing to participate in a meeting of government officials until she, the only female, left the room, and then grossly exclaiming after the meeting that she could go in to the room, now that he was done, if she wanted "sloppy seconds."

4057. "Sloppy seconds," as defined by Wikipedia, "is a slang phrase for when a man has sexual intercourse with a female or male partner who already has received another man's penis in the relevant orifice and is therefore wet or 'sloppy.'"

14

4058. Ms. Alexander concluded her article stating that she supported Taylor's opponent in the election:  "I now, therefore, fully and passionately, endorse Patti Logsdon...for the Milwaukee County Board of Supervisors...The people of Milwaukee County deserve exponentially better than what they have received in their current representation with Steve Taylor."

4059. The article is still available on line here:

http://deannaalexander.com/the-integrity-of-a-passionate-endorsement/ (last accessed November 1, 2018).

4060. Ms. Alexander's article was constitutionally protected public speech as a citizen on a matter of public concern.

4061. Ms. Alexander's speech did not contravene governmental policies or impair the proper performance of governmental functions.  To the contrary, Ms. Alexander's speech was in line with the law and public policy of Wisconsin, which discourages and, in some contexts, outlaws discrimination on the basis of sex.  *See e.g.* Wis. Stat. § 111.31(1) (employment) and § 106.52(3) (public accommodations).

4062. Ms. Alexander's article garnered significant attention, and by March 30, 2018, other County officials and citizens stood in unity with Ms. Alexander.

4063. Some of the statements in unity with Ms. Alexander can still be seen online, here: http://deannaalexander.com/more-elected-officials-

15

step-forward-as-victims-of-steve-taylors-bullying/ (last accessed

November 1, 2018).

4064. For example, Milwaukee County Supervisor Dan Sebring

wrote, on March 29, 2018:

> "I have no doubts in the veracity of recent statements made by
> Supervisor Deanna Alexander regarding our colleague,
> Supervisor Steve Taylor.  In the short time I've known
> Supervisor Taylor, I have come to know him as mean-spirited,
> vindictive and one that takes pleasure in intimidating,
> verbally, and mentally abusing those who dare to disagree
> with him.  On more than one occasion he has attempted to
> intimidate me too.  While Supervisor Taylor's voting record
> will show him to be what I consider "on the right side of the
> issue" more often than not, I find his demeanor and personal
> conduct on the board floor, in committee, and in private to be,
> in my opinion, inappropriate for one who holds public office,
> which is why I support his political opponent, Patti Logsdon."

4065. Also on March 29, 2018, Sally Ann Chadwick, Greendale

Village Trustee, wrote, in part:

> "When our Greendale citizens stand before the Franklin
> Common Council to ask their questions, give their concerns,
> ask for help from their next-door community, there is one
> thing that stands out as a glaring rebuttal – Alderman and
> Supervisor Steve Taylor.  He continually bashes, humiliates,
> taunts, and laughs at the concerns of citizens…Why the city of
> Franklin citizens, council member & mayor tolerate such a
> bully as Steve Taylor is horrific…Greendale will no longer
> tolerate the bully Steve Taylor.  I stand with Deanna Alexander
> is calling out Steve Taylor and hope the residents of his district
> will approve his opponent, Patti Logsdon to better represent
> them going forward."

4066. For another example, Resident Bryan Maersch wrote on March

30, 2018, that:

"Steve Taylor has personally come after me using his County Supervisor position, contacting my employer in an attempt to have me fired for personal political blogs I wrote revealing the truth about him. He is vindictive, and has written false emails to Franklin Aldermen about me to prevent renewal of my membership to a City of Franklin Technology Commission as appointed by the Mayor. With Steve Taylor, it's either agree with him or he will run you over."

4067. In part because of Ms. Alexander's publicity regarding Mr. Taylor's sex discrimination and harassment involving her, which emboldened others to also speak up about Mr. Taylor's bullying and harassing behavior, he lost his seat in the 2018 election to his opponent, Patti Logsdon.

4068. Because of this First Amendment protected speech on a matter of public importance, Governor Walker's administration, specifically by and through Defendants Lisa Marks and Mary Burke, set out to retaliate against Ms. Alexander so as to cause her and her colleagues to fear ever speaking out against sex discrimination, harassment, or a Republican friend and campaign volunteer of Governor Walker, again.

4069. Defendant Taylor conspired with Walker's administration, specifically by and through Lisa Marks and Mary Burke, to retaliate against Ms. Alexander for her protected free speech.

4070. Additionally, because Ms. Alexander who had been previously widely regarded as Republican, but was now aligning herself with Democratic candidates such Abele and candidates supported by

17

Democrats such as Logsdon, Lisa Marks sought to end Ms. Alexander's employment - because Governor Walker's administration now regarded Ms. Alexander as aligning with Democrats rather than Republicans.

4071. Additionally, as set forth below, contrary to common law, Walker's administration, by and through Lisa Marks, set out to retaliate against Ms. Alexander because she refused to engage in fraud in the context of providing false data to a third party in violation of a court order and/or a settlement contract that had been approved and was being overseen by the court.

4072. One of Ms. Alexander's duties as Section Chief was to be the representative of the State DCF in the reporting that was required by the ongoing obligations created by a settlement of the Jeanine B. class action lawsuit that had been filed in 1993 and was ultimately settled in 2002 with the implementation of a Corrective Action Plan.

4073. The Jeanine B. lawsuit had been filed by plaintiffs including Children's Rights, a nonprofit entity, to address allegedly high caseloads for social workers, necessary child services that were unavailable, low adoption placement rates, and the high frequency of abuse and neglect throughout Milwaukee's child welfare system.

4074. Initially, in response to the litigation, the State took over the previously county-run child welfare system.

4075. However, Children's Rights filed a supplemental complaint against the State in 2000, alleging that the State had failed to deliver promised reforms.

4076. The State reached a settlement with Children's Rights, which was approved by the court in 2002, and which set forth a Corrective Action Plan, including performance targets for the Bureau of Milwaukee Child Welfare.

4077. The Corrective Action Plan requires the State DCF to communicate official reporting quarterly to Children's Rights, and semi-annually to Children's Rights and the public, on issues such as case manager turnover rates at each case management site.

4078. The State had been complying with the reporting requirements and issuing public reports every six months on its progress in reaching the stipulated goals.

4079. The State DCF's in-house counsel who advised and represented DCF with regard to the Jeanine B. case, the settlement agreement, and the Corrective Action Plan was Attorney Mary Burke.

4080. Therefore, Ms. Alexander was responsible, in partnership with her supervisor, Dr. Joseph, and under the direction of Attorney Mary Burke, for presenting updates, in face-to-face meetings at which she was required to respond to questions from lead plaintiff's counsel, Eric Thompson, from Children's Rights.

19

4081. However, DCF's Quality Review and Performance Analysis (QRPA) unit, led by Mark Sarvela, was responsible for independently creating the Corrective Action Plan reports and Settlement Agreement reports.

4082. A meeting between the State's representatives and Eric Thompson of Children's Rights was scheduled to take place on April 13, 2018.

4083. On April 12, 2018, Ms. Alexander was working on preparing a binder for her boss, Dr. Joseph, for the following day's meetings, including the face-to-face meeting with Mr. Thompson.

4084. While Ms. Alexander was preparing the binder to inform Dr. Joseph regarding the 2017 Quarter 4 Corrective Action Plan report, some numbers immediately jumped out at her, appearing on their face to be false.

4085. For example, the report indicated that the availability of certain types of placements, like group homes and treatment foster care placements, had supposedly decreased by over 20% in a single quarter. From background information that Ms. Alexander had by way of her team's direct involvement with those placements on a regular basis, she believed that number was incorrect.

4086. Ms. Alexander started examining the underlying data and began recalculating, and found that her hunch had been correct – the report was *incorrect*.

4087. In an attempt to protect the State, the validity of the report, and the requirements of the Corrective Action Plain, Ms. Alexander worked through the night until approximately 3 a.m. to double check the accuracy of the numbers in the report, and found additional errors.

4088. Ms. Alexander was a salaried employee, ineligible for overtime, so Ms. Alexander's extra work cost the taxpayers nothing.

4089. On April 13, at 8 a.m., Ms. Alexander met with Mark Sarvela, and explained her findings to him.

4090. Mr. Sarvela said he would ask his staff to double check the numbers, but he angrily informed Ms. Alexander that the reports are "final" once published, and so at this point, the State would just have to tell plaintiff's counsel that the numbers were right, and he would consider correcting them in a future report.

4091. Ms. Alexander, not satisfied with that response, left that meeting and met with Kevin Boland, Deputy Administrator of DMCPS. Mr. Boland agreed with Ms. Alexander that the State should not put forth false information.

4092. Ms. Alexander left that meeting and met with her boss, Dr. Joseph (who had been unavailable earlier) and Dr. Joseph praised her for

21

finding the inaccurate data and thereby preventing a potential catastrophe, and further agreed with DA Boland that Ms. Alexander should not lie by presenting the report as accurately reflecting the true data.

4093. Ms. Alexander then met with Attorney Mary Burke. Attorney Burke had received an email from Ms. Alexander the night before, and began telling Ms. Alexander, as Mr. Sarvela had, that the reports are "final" once published, and so they would just have to tell plaintiff's counsel that the numbers were right.

4094. It is a fundamental and well-defined mandate of public policy and Wisconsin law that persons, especially on-duty public employees, should not engage in fraud, should not misrepresent data when there is a duty to disclose, and should not provide false data to third parties when a court order or court-approved settlement agreement requires accurate data to be provided to third parties.

4095. Attorney Burke instructed and directed both Ms. Alexander and Dr. Joseph to just pretend that they did not know that the data was false or inaccurate.

4096. Ms. Alexander explained that numerous numbers in the report were false or inaccurate, and that she would not participate in presenting the false data as accurate, and that she had the support of both DA Boland and Dr. Joseph in her decision.

22

4097. Attorney Burke was annoyed, and informed Ms. Alexander that they could not let Attorney Eric Thompson of Children's Rights know about the errors in the report, because a major tenet of the settlement agreement was the presentation of valid reports.

4098. Ms. Alexander continued to push back and stated that she refused to lie, causing Attorney Burke to reluctantly agree that Ms. Alexander would not have to lie, but instead could remain silent. Attorney Burke instructed that during the meeting with Attorney Thompson, they would just "gloss over" the incorrect numbers, and if Attorney Thompson did ask any direct questions about the incorrect numbers, Attorney Burke would be the one to respond, not Ms. Alexander.

4099. At the meeting, Attorney Thompson did notice that the numbers seemed incorrect, specifically questioned Ms. Alexander on the data in the report.

4100. Ms. Alexander, knowing that Attorney Burke wanted to pull the wool over Attorney Thompson's eyes, but also knowing that it was highly unethical if not illegal to do so, refused to answer and instead deferred the question to Mr. Sarvela and Attorney Burke for a response.

4101. Mr. Sarvela and Attorney Burke, knowing that Ms. Alexander would not go along with their lies, then apologized to Mr. Thompson for the oversight and admitted that the numbers were incorrect.

23

4102. On information and belief, the State, and in particular Attorney Burke and Lisa Marks, harbored resentment toward Ms. Alexander for working extra hours to find and document the false data in the report, making attempts to correct the report to avoid fraud and contempt of court, and insisting that Attorney Thompson not be lied to in the context of contractually required and court ordered disclosures of accurate DCF numbers, and for these reasons they further retaliated against her in the context of her employment.

4103. For example, right around this same time, Ms. Alexander's supervisor, Dr. Joseph, had been preparing Ms. Alexander's performance evaluation for the time period from August 17, 2017 to February 17, 2018.

4104. As in the case of Dr. Joseph's prior performance evaluation of Ms. Alexander, Dr. Joseph was reporting for the current period that Ms. Alexander had met every standard applicable to her employment.

4105. Ms. Alexander's supervisor also stated the following about Ms. Alexander's performance:

- "Deanna's performance in the area of overseeing, fostering, and improving relationships with the contracted agencies has been excellent. She consistently holds both large contracted agencies accountable vial the DMCPS Contract Monitoring tool report. She spearheaded the compilation of settlement agreement materials and worked diligently with DCF OLC to prepare useful information to present to opposing counsel. Deanna completed the hiring process for all of her vacant positions and has retained all the staff she hired."

- "Deanna…has performed in an exemplary manner…"

24

- "Deanna has implemented strategies and practices that have assured accountability."

- Deanna's performance "has allowed DMCPS leadership to hold agencies accountable" and "has improved quality of service to children in OOHC."

- "Deanna has observed and correctly implemented compliance with AA/EEO federal and state civil rights law."

4106. All of the above statements were accurate reviews of Ms. Alexander's actual performance.

4107. However, before this review was finalized and signed, Deputy Secretary Lisa Marks instructed Dr. Joseph to not finalize the review for Ms. Alexander.

4108. Dr. Joseph did not receive a directive like this for the personnel reviews or supervision of any other subordinate employee.

4109. Dr. Joseph held Ms. Alexander's review for a period of time as she was instructed.

4110. But, Dr. Joseph also warned Ms. Alexander that she should file a complaint with HR and seek out assistance from an attorney.

4111. Ms. Alexander had never been disciplined, given a written warning, or given a negative performance review in her year and a half working for the State.

4112. Ms. Alexander was the only Section Chief who was being targeted in this way.

25

4113. Without further prompting from the Secretary's office, and because filing at that time was necessary for the merit increase Dr. Joseph was recommending, on April 16, 2018, Dr. Joseph signed the performance review for Ms. Alexander as written, and scored Ms. Alexander as meeting all expectations applicable to her.

4114. The review signed on April 16, 2018, stated that Ms. Alexander's two-year probation was expected to end on August 8, 2018.

4115. Lisa Marks also instructed Dr. Joseph not to have any more contact with Ms. Alexander, and told her that the Secretary's office would be taking over the direct supervision of Ms. Alexander.

4116. On or around April 19, 2018, Lisa Marks drafted an email to Ms. Alexander for Dr. Joseph's signature, and instructed Dr. Joseph to send it to Ms. Alexander as if it were from Dr. Joseph.

4117. The email informed Ms. Alexander that she could no longer work a flexible schedule; rather "Effective with receipt of this email your work hours must conform to the standard hours of work…" and any future "requests for alternative schedule will need to be formally approved by the Secretary's office in advance."

4118. Previously, any request for an alternative schedule was the in the domain of the direct supervisor, and Dr. Joseph routinely approved alternative schedule arrangements for Ms. Alexander, in part because the same was promised to Ms. Alexander upon her hire, and in part because it

26

was routine for Section Chiefs to work alternative schedules because of the nature of the job requiring some off-site work meetings with contractors, some work from home, some work in the evenings, some work on weekends or holidays, and some work days in which no lunch or break time could be taken, due to periods of heavy work volume and emergencies.

4119. Around the same time, Ms. Marks asked Dr. Joseph if Ms. Alexander had been accounting for her time properly, and Dr. Joseph informed Ms. Marks that she was.

4120. By April 20, 2018, two separate DMCPS line staff employees had come to Ms. Alexander to convey concerns that they had heard rumors that "Lisa Marks had directed a hard and fast handoff" of Ms. Alexander's work to others. Ms. Alexander documented these concerns in an email, dated April 20th, to her supervisor, Dr. Joseph.

4121. On April 23, 2018, Ms. Alexander, in an effort to follow the new directives that were given solely to her, emailed the Secretary's Office requesting approval, in part, to work out of the office for a meeting with a contractor.

4122. Lisa Marks responded to that April 23rd email requesting additional information on the contractor meeting.

4123. Ms. Alexander forwarded the email string to Jo Futrell, the Affirmative Action Officer and Medical Issues Coordinator in the Bureau

27

of Human Resources of Wisconsin Department of Children and Families who is responsible for Equal Employment Opportunity compliance, and handling complaints of harassment and discrimination. Ms. Alexander wrote to Futrell, "I am highly concerned by what I see happening here."

4124. Later on April 23, 2018, Ms. Alexander had to cancel the meeting with the contractor, because Ms. Marks failed to give Ms. Alexander permission to leave the office to attend this contractor meeting.

4125. All other DCF Section Chiefs were permitted to schedule meetings, such as contractor meetings, at locations other than their desks, without prior approval, and to work through lunch, work from home as needed, or work alternative schedules as needed.

4126. No other DCF Section Chief's hours or location of work were scrutinized by Lisa Marks the way Ms. Alexander's were.

4127. Ms. Alexander was the only Section Chief, all but one of whom were male, being targeted in this way. Lisa Marks did not deny any other Section Chief permission to leave the office to attend contractor meetings, which is a routine duty of a Section Chief.

4128. In fact, Ms. Alexander's *subordinates* were permitted to continue to attend their contractor meetings, but Ms. Alexander as their supervisor, was not permitted to join them.

4129. Also on April 23, 2018, Ms. Alexander emailed Ms. Marks, explaining that she did not understand why she was suddenly being

28

treated differently, and did not understand why she was not being treated similarly to her peers.

4130. On April 24, 2018, Dr. Joseph emailed Lisa Marks and said:

"As you have directed I have not and will not meet with Deanna until…I am not sure when I should resume meetings with her, yet you should know that our regular status meeting has been cancelled and another is on the horizon. She is seeking me out as we usually meet and she does not understand why I am no longer meeting with her. I am not certain how you want me to proceed with her as I generally direct her work and am now giving her no direction. Please advise how you want me to respond to her queries."

4131. At this point, and on Dr. Joseph's recommendation, Ms. Alexander filed an internal complaint alleging that she was being targeted, harassed, and treated unfairly due to her membership in a protected class – namely, on the basis of her sex.

4132. Due to reported conflicts of interest, Ms. Alexander's complaint was sent to the Department of Administration for investigation, and that assignment was accepted on or around April 24, 2018, by Jeanette Johnson and Brenda Brewer.

4133. On or about May 4, 2018, Ms. Johnson and Ms. Brewer interviewed Ms. Alexander, who was already being targeted, and who feared further retaliation, regarding her complaint of discrimination.

4134. Ms. Alexander was promised that, through the pendency of the investigation, the content of her complaint and the findings of the investigation would be kept completely confidential.

29

4135. Ms. Alexander told Ms. Johnson and Ms. Brewer the truth – that she was making this protected complaint at the suggestion of her supervisor, Dr. Joseph.

4136. On May 5, Secretary Eloise Anderson told Ms. Jospeh that she was being fired because she had coached Ms. Alexander to retain an attorney, and Ms. Alexander was "at the governor's office running her mouth" and they had to fire Dr. Joseph to get to Ms. Alexander.

4137. DCF gave Dr. Joseph the option to resign in lieu of termination, and Dr. Joseph took that option, with an effective last day of June 1st.

4138. On or about May 7, Ms. Johnson and Ms. Brewer completed an intake report summarizing Ms. Alexander's concerns.

4139. On or about May 8th, DCF Legal Counsel Mary Burke, who should not have even known about Ms. Alexander's confidential complaint, began requesting to review Ms. Alexander's confidential complaint and investigatory documents.

4140. On or about May 8th, Ms. Johnson and Ms. Brewer were also informed that Dr. Joseph had submitted her resignation effective June 1, 2018.

4141. On May 21, 2018, Ms. Johnson and Ms. Brewer interviewed Dr. Joseph, who confirmed that Ms. Alexander was an unproblematic employee who was being treated unfairly.

30

4142. In the meantime, Ms. Alexander continued to do her best to follow the new directives of Lisa Marks that applied only to Ms. Alexander and no other Section Chief, and to continue working without any direction from Dr. Joseph, who had been forbidden from meeting her direct report, Ms. Alexander.

4143. For example, on May 2, 2018, Ms. Alexander emailed Ms. Marks, explaining that though she technically had the day off as it was her birthday, she was requesting permission to work 2 hours from home, due to the need to respond to some important emails and a request from Eric Thompson that had come in at 7 pm the night before. Additionally, Ms. Alexander wrote, "I also renew my request to speak with you about this situation, particularly because adhering to your directive impairs my discretion as a manager to respond to important needs of my section or the division."

4144. Ms. Marks responded to the email stating that Ms. Alexander's request to work two hours from home was approved.

4145. Ms. Marks ignored Ms. Alexander's plea to speak with her for clarification of the new directives being applied only to her.

4146. Ms. Marks did not require any other Section Chief to get prior permission to return some phone calls or emails from home if a work need presented itself while the Section Chief was home or otherwise out of the office.

31

4147. For example, Section Chief Phillip Zellmer regularly worked from home.

4148. Ms. Marks continued to directly oversee Ms. Alexander's schedule until approximately May 9, 2018. On that date, Ms. Marks emailed Ms. Alexander informing her that until a new Division Administrator was appointed, "Kenyon Kies will be acting as approval authority for any of your activity/time reporting that deviates from DCF normal working hours. Please submit your request to Kenyon by 4:30 p.m. every Wednesday for any proposed schedule deviations for the following week…"

4149. Mr. Kies was a direct report to Ms. Marks, and was the Economic Development Specialist. The Economic Development Specialist was not a supervisory position, and had no meaningful tie to Ms. Alexander's role as Section Chief.

4150. On May 21, 2018, the same date that Dr. Joseph had been interviewed for Ms. Alexander's protected complaint, two State employees, Margaret McMahon and Christine Preston, were assigned to conduct a disciplinary personnel investigation on Ms. Alexander.

4151. On May 30, 2018, Ms. Preston emailed a Notice of Investigatory Interview, informing Ms. Alexander that she was to attend an investigatory meeting on June 1, 2018.

32

4152. On information and belief, Ms. Marks scheduled the Investigatory Interview on June 1, 2018, because it was Dr. Joseph's last day, and therefore the first day that Dr. Joseph, as a supervisor and the person most familiar with Ms. Alexander's performance on the job, would be wholly unable to protect or defend Ms. Alexander from the wrongs that were being inflicted upon her.

4153. On June 1st, Ms. Alexander was interrogated by her employer for four hours, mostly regarding the schedule she kept.

4154. Ms. Alexander asked Ms. Preston to interview or question Dr. Joseph to confirm that all of Ms. Alexander's actions had been approved by her supervisor, but Ms. Preston stated that talking with Dr. Joseph would not be necessary.

4155. Also on June 1st, Ms. Alexander reiterated her claim of sex discrimination, noting that the three male DCF Section Chiefs were not scrutinized and targeted the way she was, and that this disciplinary investigation was retaliatory.

4156. On June 6th, Ms. Alexander emailed Christine Preston and Margaret McMahon many documents, such as emails, which confirmed she had always followed the directives of her supervisor and DCF regarding her schedule, use of flex time, and the like.

4157. The investigation concluded on June 12, 2018, finding that Ms. Alexander had *not* violated the August 8, 2016, Conflict of Interest Memo,

33

had *not* violated DCF's Code of Ethics; had *not* violated DCF's policy on outside employment; and had *not* violated the Code of Ethics for State Employees.

4158. The investigation did find that Ms. Alexander had regularly worked through lunch; had worked some holidays like the Fourth of July; and had worked a flexible schedule, but also that it had all been preapproved by her supervisor, Dr. Joseph, and importantly noted that Ms. Alexander " *'punched in and out' when conducting non-DMCPS business and was not paid for the actual time that she conducted the non-DMCPS business.*" (emphasis added.)

4159. In other words, Ms. Alexander had done absolutely nothing wrong.

4160. Moreover, all supervisors such as Section Chiefs routinely, as work needs dictated, worked through lunch or over a holiday, or worked late to deal with an emergency, without any discipline from the State.

4161. On June 15, 2018, Ms. Alexander received an "official notification of the Department's decision to terminate [her] probationary employment…based on determination that [her] performance does not meet the standards expected of the DMCPS Ongoing Services Section Chief."

4162. She was given no specific reason for her termination, other than the vague, pretextual reason that her "performance did not meet the

34

standards expected," "including but not limited to violations of State and Department Work Rules and Policies."

4163. Yet, as Ms. Alexander's personnel evaluations show, Ms. Alexander had met every single standard expected of her, and her termination was wholly unlawful, and based on pure pretext.

4164. Even though at the time of termination Ms. Alexander did not have a clear understanding of the State's purported reasons for terminating her, Mr. Steve Taylor somehow knew of the details of Ms. Alexander's termination, and immediately following her termination took credit in the press for having gotten Ms. Alexander terminated.

4165. When she was terminated, the State asked Ms. Alexander to sign a resignation letter they had prepared for her, but she refused, because she has dedicated her whole life to the service of American citizens and specifically Wisconsin children and families, and planned to do so for the indefinite future.

4166. On June 28, 2018, the Department of Administration investigators decided, as they reported in an email, that "For Deanna's case, we should close the file without any follow-up, for the following reasons: DCF terminated Deanna while we were still looking into her complaint allegations and DPM approved the termination. Also, Deanna has retained an attorney, so any remedies (if appropriate), will most likely need to be facilitated through an external mediation/settlement process."

35

4167. Almost six weeks later, on August 10, 2018, DOA refused to produce documents pertaining to Ms. Alexander's internal complaint in response to an open records request, claiming that the investigation into Ms. Alexander's treatment was ongoing.

4168. On September 10, 2018, DOA issued a finding that "there is insufficient evidence to support a finding that the actions Alexander outlined constitute unlawful harassment or discrimination based on Alexander's membership in a protected category.

4169. Ms. Alexander is currently seeking alternative State employment and reasonably fears that her rights and the rights of all state civil service employees will be continued to be violated until the Walker Administration stops routinely judging those employees on the impermissible basis of political affiliation, rather than on the only legal basis – their merits and actual job performance.

## V. VIOLATIONS OF LAW

### A. Impermissible Political Affiliation Motivation in Employment Action, First and Fourteenth Amendments: Lisa Marks and Mary Burke

501. Individual Defendants, as a state actor acting under color of state law, made an employment decision based on political affiliation for a non-political, civil service career executive position, which was required by Wisconsin Administrative Code to be made solely on merit and without consideration of political affiliation, which negatively impacted Plaintiff Alexander when she was terminated, in

36

violation of the rights secured to Plaintiff Alexander by the First and Fourteenth Amendments to the Constitution of the United States. There should be no place in America where powerful government officials are allowed to misuse their offices and mistreat their civil servants for political purposes, or deprive good civil servant employees of their jobs simply because they have aligned their political affiliation with Democratic candidates while a Republican governor is in office. See, e.g., *Elrod v. Burns*, 427 U.S. 347, 367-68 (1976); *Rutan v. Republican Party*, 497 U.S. 62 (1990); *Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1416, 194 L. Ed. 2d 508 (2016).

### B.  Retaliation for Speech on Matters of Public Concern, First and Fourteenth Amendments: Lisa Marks and Mary Burke

502.     Individual Defendants, acting under color of law, violated Plaintiff Alexander's First Amendment rights when she retaliated against Plaintiff Alexander for writing an article on a matter of public concern - speaking out against then County Representative Steve Taylor's sex discrimination, harassment, and bullying while holding public office in the County of Milwaukee.  Punishing and deterring Plaintiff Alexander from making these and similar public interest complaints was a substantial motivating factor behind the Department of Children and Family Services' termination of Plaintiff Alexander in violation of rights secured to her by the First and Fourteenth Amendments to the United States Constitution.  See e.g. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).

### C. Conspiracy to Deprive Plaintiff of First Amendment Rights under § 1983 and of Equal Protection of Rights based on her Sex in violation of § 1985(3): Lisa Marks, Mary Burke, and Steve Taylor

503.    Individual Defendants Lisa Marks and Mary Burke, acting under color of state law, and Steve Taylor, acting as a private citizen, conspired together to inflict harm on Plaintiff Alexander, for the purpose of depriving Plaintiff Alexander of rights secured to her by the First Amendment and the equal protection of the law and privileges under the laws, including the right to be treated equally regardless of sex and the right to be free from sex discrimination and sexual harassment, and acted in furtherance of this conspiracy by depriving Plaintiff Alexander of her job, causing financial and other injuries to her, in violation of 42 U.S.C. §§ 1983 and 1985(3) and the Fourteenth Amendment.

### D. Equal Protection Clause, Class of One, Fourteenth Amendment: Lisa Marks and Mary Burke

504.    Individual Defendants, acting under color of state law, discriminated against Plaintiff Alexander as a class of one, by intentionally and vindictively treating her differently than similarly situated employees and terminating her without a rational basis for doing so, in retaliation for Plaintiff Alexander's cooperation with, and public support of, Democrat Milwaukee County Executive Chris Abele who had previously terminated Lisa Marks from her County employment, in violation of the rights secured

to her by the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

505.    Individual Defendants, acting under color of state law, discriminated against Plaintiff Alexander as a class of one, by intentionally and vindictively treating her differently than similarly situated employees and terminating her with a rational basis for doing so, in retaliation for Plaintiff Alexander's refusal to present false data as accurate to Attorney Eric Thompson of Children's Rights in the context of reporting required by a court enforced settlement agreement.

### E.    Pendant State Law Claim, Common Law Wrongful Termination: Department of Children and Family Services

507.    Defendant Department of Children and Family Services attempted to force Plaintiff Alexander to commit fraud, specifically instructing her to provide false data to a third party contrary to a court order, law, and established public policy, and when she refused to engage in lies, deceit, and fraud, Defendants retaliated against her by terminating her employment in a way that contravenes the public welfare and gravely violates paramount requirements of public interest.

## VI.   RELIEF

## A.  DAMAGES

### Compensatory Damages

601.    By virtue of unlawful actions alleged above, Plaintiff Alexander, sustained economic losses and expenditures, loss of income, professional humiliation, harm to business and reputation, and other damages for which she should be compensated in an amount deemed just by the Court.

### Punitive Damages

602.    Because the acts of the individual defendants herein alleged were carried out maliciously or with reckless disregard for the Plaintiffs' fundamental rights, the Plaintiff seeks awards of punitive damages against the individual Defendants to deter them and others similarly situated from similar wrongful acts in the future.

## B.  Equity.

603.    Because it is so obvious that career civil servants, including Ms. Alexander personally, will continue to be unconstitutionally terminated on the basis of their political affiliation at the hands of the Walker Administration, to the detriment of all citizens of Wisconsin, Plaintiff therefore invokes the Court's equitable jurisdiction to award declaratory or injunctive relief against Governor

40

Walker.

## VII.   CONDITIONS PRECEDENT

701.   All conditions precedent to this action, within the meaning of Rule 9(c),

Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII.   DEMAND FOR JURY TRIAL

801.   The Plaintiffs hereby demand a trial by jury of all issues triable of right to

a jury.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alexander prays that the Court grant judgment against

the Defendants, awarding the Plaintiffs:

901.   Monetary damages in amounts that will fairly compensate the plaintiff for

her injuries;

902.   Punitive damages in amounts that will justly punish the defendants for

their actions;

903.   Appropriate injunctive relief;

904.   The costs, attorneys' fees and litigation expenses as well as any further

relief this Court deems just.

Dated this Friday, November 02, 2018.

Respectfully submitted, Deanna Alexander, Plaintiff,

41

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar No. 1016284
ANDREA J. FARRELL
State Bar No. 1064773
131 W. Wilson St., Suite 1200
Madison, WI 53703
Phone:          (608) 283-6001
Facsimile:     (608) 283-0945
E-mail:         jsolson@scofflaw.com
                    ajf@scofflaw.com


/s/ Andrea J. Farrell
_____
ANDREA J. FARRELL
ATTORNEYS FOR PLAINTIFF