# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DEANNA ALEXANDER,**

    Plaintiff,

  v.                                                    Case No. 18-CV-1744

**WISCONSIN DEPARTMENT OF
CHILDREN AND FAMILY SERVICES, et al.,**

    Defendants.

## DECISION AND ORDER ON DEFENDANTS'
## MOTIONS TO DISMISS

Deanna Alexander, a former Section Chief for the Wisconsin Department of Children and Family Services ("DCF"), sues DCF, former Deputy Secretary of DCF Lisa Marks, DCF's former in-house counsel Mary Burke (collectively the "State Defendants"), and Steve F. Taylor, a private citizen, for violations of the First and Fourteenth Amendments, 42 U.S.C. § 1983; civil conspiracy, 42 U.S.C. § 1985(3); state common-law wrongful termination; and state tortious interference with relationships. Taylor and the State Defendants move to dismiss Alexander's conspiracy count on the grounds that it fails to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). Taylor also moves under Rule 12(b)(6) to dismiss Alexander's tortious interference count. For the reasons that follow, the defendants' motions are denied.

## BACKGROUND

According to the Amended Complaint, in 2012, Deanna Alexander was elected to serve on the Milwaukee County Board of Supervisors. (First Amended Complaint ¶ 4009,

Docket # 30.) A few years later, in the summer of 2016, she was hired as a Section Chief for the Wisconsin Department of Children and Family Services. (*Id.* ¶ 4006.) Alexander continued to serve as a County Supervisor while employed with DCF. (*Id.* ¶¶ 4011–15.) At DCF, Alexander's direct supervisor was Division Administrator Robin Joseph. (*Id.* ¶¶ 4015, 4019, 4022, 4026.) Joseph, in turn, directly reported to the Secretary's Office of DCF. (*Id.* ¶ 4019.) In April 2017, then-Governor Scott Walker appointed Lisa Marks as the Deputy Secretary of DCF. (*Id.* ¶ 4030.) Marks and Governor Walker had previously "worked closely together in Milwaukee County government." (*Id.* ¶ 4031.)

Alexander's employment with DCF was going well—she consistently received positive performance evaluations and praise from Joseph—until early 2018, when Marks and Steve Taylor, then a Milwaukee County Supervisor, allegedly began scheming as to how to unlawfully oust Alexander from her State job. (*Id.* ¶¶ 4027–29, 4051.) Alexander states that Taylor is a Republican and a close political ally of Governor Walker, (*id.* ¶ 4053), and that Walker, Marks, and Taylor worked closely together and were connected politically during Walker's time as Milwaukee County Executive. (*Id.* ¶ 4033.)

On March 28, 2018, Alexander wrote an article speaking out against the sexual harassment and sex discrimination she had allegedly experienced at the hands of Taylor. (*Id.* ¶ 4052.) The article explained in detail how Taylor had refused to participate in a meeting involving government officials until Alexander, the only female, left the room and how, after the meeting, Taylor told Alexander she could go into the room "if she wanted 'sloppy seconds.'" (*Id.* ¶ 4056.) The article also expressed Alexander's support for Taylor's Democratic opponent in the upcoming election, Patti Logsdon. (*Id.* ¶ 4058.) Alexander's article garnered significant media attention and resulted in other County officials and

2

citizens standing in unity with her. (*Id.* ¶¶ 4062–66.) The publicity surrounding Alexander's article contributed to Taylor losing his seat as a County Supervisor to Logsdon in the 2018 Spring election. (*Id.* ¶ 4067.)

In retaliation for the article and Alexander's perceived aligning with Democrats, Taylor and the Walker administration, through Marks and Mary Burke, DCF's in-house counsel, allegedly conspired together to have Alexander fired. (*Id.* ¶¶ 4068–69, 4070.) Taylor complained about Alexander to her supervisor, Joseph. (*Id.* ¶¶ 4069(a)–(b).) Joseph, however, did not believe Taylor's complaints had merit, so Taylor contacted Joseph's superiors, including but not limited to Marks. (*Id.* ¶¶ 4069(c)–(d).)

Thereafter, Alexander began experiencing problems with her superiors at DCF. In April 2018, Joseph drafted Alexander's performance evaluation, which, like the previous one, was quite positive. (*Id.* ¶¶ 4103–06, 4111.) Marks instructed Joseph not to finalize or sign the evaluation; Joseph did not receive a similar directive regarding any of her other subordinates. (*Id.* ¶¶ 4107–08, 4112.) Although Joseph initially withheld the evaluation as instructed, she did advise Alexander to file a complaint with HR and seek out assistance from an attorney. (*Id.* ¶¶ 4109–10.) Joseph ultimately signed the evaluation as originally drafted. (*Id.* ¶¶ 4113–14.) In response, Marks allegedly instructed Joseph not to have any more contact with Alexander and told her that the Secretary's Office would be taking over the direct supervision of Alexander. (*Id.* ¶ 4115.)

Marks also drafted an email for Joseph's signature, revoking Alexander's previously authorized flexible work schedule and informing Alexander that future requests for an alternative schedule would need advance approval from the Secretary's Office. (*Id.* ¶¶ 4116–18.) Around this same time, two separate DCF colleagues told Alexander that they heard

3

that Marks was handing off her work to others. (*Id.* ¶ 4120.) Alexander became concerned that she was being targeted, and she expressed her beliefs to Marks and DCF's Affirmative Action Officer. (*Id.* ¶¶ 4123–29.)

On Joseph's recommendation, Alexander filed an internal complaint alleging that she was being targeted, harassed, and treated unfairly on the basis of her sex. (*Id.* ¶ 4131.) The complaint was sent to the Wisconsin Department of Administration ("DOA") for investigation. (*Id.* ¶ 4132.) Alexander told DOA investigators "that she was making this protected complaint at the suggestion of her supervisor, Dr. Joseph." (*Id.* ¶¶ 4133, 4135.) Despite assurances that the investigation would be confidential, (*id.* ¶ 4134), on May 5, 2018, DCF Secretary Eloise Anderson told Joseph "that she was being fired because she had coached Ms. Alexander to retain an attorney," "Ms. Alexander was 'at the governor's office running her mouth,'" and "'they had to fire Dr. Joseph to get to Ms. Alexander,'" (*id.* ¶ 4136). A few weeks later, Joseph was interviewed by DOA investigators. (*Id.* ¶ 4141.) She told them that Alexander "was an unproblematic employee who was being treated unfairly." (*Id.*) Joseph eventually decided to resign in lieu of termination. (*Id.* ¶ 4137.)

The same day Joseph met with investigators, a disciplinary personnel investigation was opened concerning Alexander. (*Id.* ¶ 4150.) Alexander was summoned to an investigatory meeting on June 1, 2018—the day Joseph's resignation took effect. (*Id.* ¶¶ 4151–52.) "Alexander was interrogated . . . for four hours, mostly regarding the schedule she kept." (*Id.* ¶ 4153.) The investigation concluded on June 12, 2018, finding no wrongdoing by Alexander. (*Id.* ¶¶ 4157–59.) Nevertheless, on June 15, 2018, Alexander's probationary employment was terminated purportedly because "'[her] performance [did] not meet the standards expected of [her].'" (*Id.* ¶¶ 4161–62.)

4

Almost immediately after she was fired, Alexander was contacted by Dan Bice, a reporter for the Milwaukee Journal Sentinel. (*Id.* ¶ 4164(a).) Bice told Alexander that "Taylor was 'taking credit' for Ms. Alexander's termination." (*Id.* ¶¶ 4164(b)–(c).) Bice wrote an article, published on June 27, 2018, claiming that Taylor had told him that he complained to Alexander's supervisor earlier that year "that she was doing county campaign work on state time." (*Id.* ¶ 4164(d)[1].) The article also claimed that Taylor had told Bice that "he called the state" after Alexander apparently told Logsdon, Taylor's election opponent, that Taylor was absent for a certain government meeting. (*Id.*) About three months after the article ran, Bice claimed that Taylor informed him that Alexander "was 'in mediation' with the State." (*Id.* ¶ 4168(a).)

By February 2019, Alexander had obtained employment as Treasurer for the Republican Party of Milwaukee County. (*Id.* ¶ 4170.) Taylor called Sam Hagedorn, the organization's Chair, "to complain about, and question the wisdom of, having Ms. Alexander serve the Republican Party as Treasurer." (*Id.* ¶ 4172.) Hagedorn, however, "gave Taylor short shrift." (*Id.* ¶ 4173.)

## STANDARD OF REVIEW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint on the basis that the plaintiff has failed to state a claim upon which relief can be granted. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this language to require that the plaintiff plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Ashcroft v. Iqbal*,

---

[1] This paragraph is erroneously numbered 6164(d) in the Amended Complaint.

the Supreme Court elaborated further on the pleadings standard, explaining that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," though this "standard is not akin to a 'probability requirement.'" 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citation omitted).

When determining the sufficiency of a complaint, the court should engage in a two-part analysis. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). First, the court must "accept the well-pleaded facts in the complaint as true" while separating out "legal conclusions and conclusory allegations merely reciting the elements of the claim." *Id.* (citing *Iqbal*, 556 U.S. at 680–81). Next, "[a]fter excising the allegations not entitled to the presumption [of truth], [the court must] determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.'" *McCauley*, 671 F.3d at 616 (quoting *Iqbal*, 556 U.S. at 681). As explained in *Iqbal*, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679 (citation omitted). All factual allegations and any reasonable inferences must be construed in the light most favorable to the nonmoving party. *Price v. Bd. of Educ. of Chicago*, 755 F.3d 605, 607 (7th Cir. 2014).

## ANALYSIS

Alexander alleges six causes of action against the defendants: (1) impermissible political affiliation motivation in employment action [Marks and Burke]; (2) retaliation for speech on matters of public concern [Marks and Burke]; (3) conspiracy to deprive plaintiff of First Amendment rights under 42 U.S.C. § 1983 and of equal protection of rights based on

her sex in violation of 42 U.S.C. § 1985(3) [Marks, Burke, and Taylor]; (4) Equal Protection Clause, class of one [Marks and Burke]; (5) common-law wrongful termination [DCF]; and (6) tortious interference with relationships [Taylor]. (Am. Compl. ¶¶ 501–08.) Alexander's class-of-one Equal Protection claim has been dismissed. (Minute Sheet for Telephonic Scheduling Conference, Docket # 46.) Defendants Marks, Burke, and Taylor have moved to dismiss Alexander's conspiracy claim, and Defendant Taylor has moved to dismiss Alexander's tortious interference claim.

    *1.    Conspiracy to Deprive Plaintiff of First Amendment and Equal Protection Rights*

Alexander alleges in her third cause of action that Marks and Burke, acting under color of state law, conspired with Taylor, a private citizen, to deprive Alexander of her rights (1) to be treated equally regardless of sex and (2) to be free from sex discrimination and sex harassment, in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and the Fourteenth Amendment. (Am. Compl. ¶ 503.) Taylor argues that Alexander's conspiracy claim fails because the Amended Complaint does not plausibly allege that he conspired with Marks and Burke to deprive Alexander of her constitutional rights. (Taylor's Brief in Support at 5–6, Docket # 32; Taylor's Reply Brief at 2–5, Docket # 37.) Marks and Burke have joined in Taylor's motion. (Brief in Support of Motion to Dismiss Equal Protection and Conspiracy Claims Against Burke and Marks, Docket # 35; State Defendants' Reply, Docket # 38.)

"To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that: (1) [s]he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon [her] by a person or persons acting under color of state law." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing

7

*Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)). "Typically, a section 1983 violation occurs when the state or one of its agents violates a plaintiff's constitutional rights." *Cunningham v. Southlake Ctr. for Mental Health*, 924 F.2d 106, 107 (7th Cir. 1991). "When a private actor is implicated, the section 1983 plaintiff may nevertheless prevail if [s]he shows sufficient state involvement in the action in question to trigger constitutional protections." *Id.* (citing *NCAA v. Tarkanian*, 488 U.S. 179, 192 (1988)). For example, "[p]rivate action can become state action when private actors conspire or are jointly engaged with state actors to deprive a person of constitutional rights." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009) (citing *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980)).

"Section 1985(3) prohibits a conspiracy to deprive another of equal protection under the law." *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). It provides in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

> A plaintiff raising a claim under § 1985(3) must allege (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens.

*Brokaw v. Mercer County*, 235 F.3d 1000, 1024 (7th Cir. 2000) (quoting *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996)).

Taylor argues that the Amended Complaint, when stripped of its conclusory statements, fails to plausibly show that there was a conspiratorial agreement between Taylor

and the State Defendants. I disagree. "The very nature of a conspiracy obscures most, if not all, information about the alleged conspirators' agreement." *Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985). Consequently, according to the Seventh Circuit, "it is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002). To survive a motion to dismiss "in a section 1985(3) action, the complaint must simply plead sufficient facts from which a conspiracy can be inferred; the facts detailing the conspiratorial agreement can be pleaded generally, while those facts documenting the overt acts must be pleaded specifically." *Quinones*, 771 F.2d at 291 (citations omitted).

Alexander has alleged sufficient facts from which it can be inferred that Taylor conspired with Marks and Burke to oust Alexander from her State job in retaliation for her March 2018 article. First, the Amended Complaint provides a motive for Taylor and the State Defendants to work together against Alexander. Days before the 2018 Spring election, Alexander publicly aired an incident damaging to Taylor's reputation and expressed her support for Taylor's election opponent. Alexander's article garnered significant attention in the media, and Taylor ultimately lost the election. According to the Amended Complaint, Taylor was fueled by revenge, believing that Alexander had cost him his seat on the County Board of Supervisors. Marks and Burke—loyal supporters of Republican Governor Scott Walker—were also politically motivated to get rid of Alexander, according to the Amended Complaint, as they regarded Alexander as aligning with the enemy: Democrats. The Amended Complaint therefore sufficiently alleges that Taylor and the State Defendants shared a common goal of silencing and harming Alexander.

Second, the Amended Complaint allegedly shows that Taylor and the State Defendants had an opportunity to work in concert together. The Amended Complaint alleges that Taylor, Marks, and Burke all ran in the same political circle, with Governor Walker as their center. Indeed, the Amended Complaint alleges that Taylor and Marks had worked closely with, and developed strong political ties to, Walker when he was Milwaukee County Executive. When Walker became governor, Marks was let go by the new County Executive, Chris Abele. (Am. Compl. ¶ 4044.) Marks then joined the Walker administration, first as an Administrator at DOA and later as Deputy Secretary of DCF. (*Id.* at 4046.) Thus, the Amended Complaint sufficiently alleges that Taylor, Marks, and Burke were allies unified by a common political leaning.

Finally, combined with the suspicious timing, Taylor's alleged braggadocious admissions make it plausible that he worked with the State Defendants to unconstitutionally terminate Alexander. According to the Amended Complaint, after Alexander's article criticizing Taylor and expressing support for his election opponent, Taylor contacted Alexander's direct supervisor in an effort to get her fired. When that didn't work, Taylor sought out Marks, his former colleague and ally at the County. The Amended Complaint alleges that, immediately thereafter, Marks and Burke targeted Alexander and began treating her differently than the other (mostly male) Section Chiefs. They allegedly began closely scrutinizing Alexander's work, initiated a disciplinary personnel investigation of Alexander, and ultimately terminated Alexander's employment. They did all this in less than three months after Alexander's article was published and despite Alexander's previously unblemished employment record at DCF. The Amended Complaint further alleges that, after Alexander's termination, Taylor admitted to complaining about

Alexander to her supervisor earlier that year and took credit for Alexander's firing. These allegations suggest more than simply "parallel conduct" by Taylor and the State Defendants but rather concerted action to achieve a common goal.

In sum, Alexander has sufficiently pled a § 1985(3) conspiracy claim. The Amended Complaint describes the parties involved (Taylor, Marks, and Burke), the general purpose of the conspiracy (to oust Alexander from her State job), and the approximate date the conspiracy commenced (shortly after Alexander's March 2018 article). These allegations are sufficient to put the defendants on notice of what they are charged with. Accordingly, I will deny the defendants' motions to dismiss Alexander's conspiracy claim.

*2. Tortious Interference with Relationships*

In her sixth cause of action, Alexander alleges that Taylor violated state law by "repeatedly and intentionally, without privilege or justification but merely out of spite and hatred, interfered with Ms. Alexander's known contractual and business relationships, for the purpose of actually disrupting those relationships." (Am. Compl. ¶ 508.) This conduct, according to Alexander, resulted in the termination of her State employment and caused her damages. (*Id.*) Taylor argues that Alexander's tortious interference claim fails because the Amended Complaint does not plausibly allege that Taylor intentionally interfered with Alexander's State employment. (Taylor's Br. at 7–9; Taylor's Reply at 5–7.)

Under Wisconsin law, a claim for tortious interference with a contract requires proof of five elements:

> (1) the plaintiff had a contract or a prospective contractual relationship with a third party, (2) the defendant interfered with that relationship, (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged to interfere.

*Wesbrook v. Ulrich*, 840 F.3d 388, 395 (7th Cir. 2016) (quoting *Briesemeister v. Lehner*, 720 N.W.2d 531, 542 (Wis. Ct. App. 2006)).

Taylor argues "that Alexander has not adequately pleaded the first four elements of the claim, because her pleadings consist of conclusory statements masquerading as factual allegations." (Taylor's Reply at 7.) I disagree. The allegations in the Amended Complaint are supported by sufficient factual material, which, accepted as true, plausibly suggests that Taylor intentionally interfered with Alexander's State employment.

The Amended Complaint alleges that (1) Alexander was employed as a Section Chief for DCF, a State agency, (Am. Compl. ¶ 4006); (2) Taylor interfered with Alexander's State employment by complaining to her supervisors in an attempt to get her fired, (*Id.* ¶¶ 4069, 508); (3) Taylor desired to get back at Alexander for publicly damaging his reputation, (*Id.* ¶¶ 4051–69); and (4) soon after Taylor's complaints, Alexander was fired, and Taylor took credit for it, (*Id.* ¶¶ 4161, 4164). The first and fourth allegations are well-pleaded facts that the court must accept as true in deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6). In the second allegation, while the phrase "interfered with" appears conclusory, here it is supported by a well-pleaded fact: Alexander was fired after Taylor complained to her supervisors. The second allegation therefore is also entitled to the presumption of truth. As to the third and arguably most problematic allegation, it can reasonably be inferred that Taylor acted with the requisite intent. Shortly after Alexander's public comments about him, Taylor allegedly complained about Alexander to her direct supervisor, Joseph. When that complaint was ignored, Taylor allegedly contacted Marks—Joseph's supervisor—and Alexander was fired less than three months later. The timing of Taylor's alleged conduct,

combined with his taking credit for Alexander's firing in the media, plausibly suggests that he wanted to Alexander to pay for her public comments about him.

Taylor argues that the Amended Complaint fails to show that his alleged conduct was tortious, claiming the allegations suggest that he contacted Alexander's supervisor as merely a concerned citizen and bragged about doing so to a reporter. (Taylor's Br. at 8.) That is one way to view the factual allegations contained in the Amended Complaint. But, in deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must construe all factual allegations in the light most favorable to, and make all reasonable inferences in favor of, the nonmoving party. *See Price*, 755 F.3d at 607. Thus, at this stage Alexander does not need to negate potential counterarguments regarding Taylor's intent. For the reasons stated above, as pled, the Amended Complaint plausibly suggests that Taylor intended to interfere with Alexander's State employment.

Accordingly, I will deny Taylor's motion to dismiss Alexander's state-law tortious interference claim.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Defendant Taylor's Motion to Dismiss First Amended Complaint (Docket # 31) is **DENIED**.

**IT IS FURTHER ORDERED** that the State Defendants' Motion to Dismiss (Docket # 34) is **DENIED** to the extent it seeks dismissal of Alexander's conspiracy claim.

Dated at Milwaukee, Wisconsin this 18th day of October, 2019.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge